UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION
CIVIL ACTION NO. 3:14-CV-00628-TBR

DOUGLAS W. GREENE                                                    PLAINTIFF

v.

INDEPENDENT PILOTS ASSOCIATION, *et al.*                   DEFENDANTS

## Memorandum Opinion

This case and its companion cases, *Greene v. Frost Brown Todd, LLC, et al.*, No. 3:14-CV-00619-TBR, and *Greene v. IPA/UPS System Board of Adjustment*, No. 3:15-CV-00234-TBR, arise from Plaintiff Douglas W. Greene's dismissal from his employment as a pilot for United Parcel Service Co.   In this case, Greene alleges that Independent Pilots Association, the union that represents UPS's pilots, failed to fairly represent him during his termination proceedings, and retaliated against him for his political activity within the union.   *See* [DN 1.][1]   Before the Court are several motions, most notably IPA's motion for summary judgment.   [DN 50.]   For the reasons explained below, that motion [DN 50] is GRANTED.   Therefore, IPA's motion to dismiss pursuant to Rule 37(b) or to compel discovery, [DN 51], motion for temporary restraining order, [DN 55], and motion for reconsideration, [DN 62], are DENIED AS MOOT.   IPA's motion for leave to file excess pages [DN 74] is GRANTED.   Finally, IPA's motion for sanctions [DN 54] is DENIED.

---

[1] Greene brings identical claims against IPA and five of its officers in their official capacities.   *See* [DN 1.]   In this opinion, the Court uses "IPA" and "Defendants" synonymously.

## I. Facts and Procedural History

Douglas Greene is an experienced airline pilot with more than twenty years of experience flying large commercial aircraft, including the Boeing 747-400.  His employment as a UPS pilot began in 1994 and ended with his termination on November 22, 2013.  Greene's early years of employment with UPS appear to have been relatively uneventful.  In March 2011, however, UPS subjected Greene to termination proceedings for the first time.  [DN 50-3 at 6.]  The facts and merits of Greene's 2011 termination are unrelated to the case at bar, except that during that termination, Independent Pilots Association filed a grievance on Greene's behalf. [*Id.*]  IPA was successful in pursuing Greene's grievance, and negotiated a settlement that allowed Greene to keep his job.  [*Id.*]

At the same time, Greene was under investigation by the Kentucky Department of Revenue.  [DN 50-47 at 14.]  UPS's flight operations are based in Louisville, Kentucky, and Kentucky authorities apparently believed that some pilots, including Greene, were domiciled in the Commonwealth but were not paying the correct amount of state income taxes.  Greene and his fellow UPS pilots were ultimately successful in fending off the tax assessments.  [*Id.*]  During his tax dispute, Greene sought to have an anonymous letter published in IPA's bi-weekly newsletter, *Flight Times*.  *See* [DN 50-3 at 3.]  IPA's policy did not allow the publication of anonymous letters to the editor, so IPA declined Greene's request. [DN 50-58 at 2.]  IPA President Robert Travis claims that in his attempts to have his letter published, Greene made "inappropriate, verbally abusive and potentially

2

threatening and slanderous statements" to others concerning IPA and its officials. [DN 50-3 at 3-4.]   Because of Greene's conduct, IPA's Executive Board decided to designate Edwin S. Hopson, outside counsel at Wyatt, Tarrant & Combs, as Greene's sole point of contact with IPA for any issues related to his tax dispute. [*Id.* at 4.]

Greene's second dismissal proceedings occurred in 2013.   On March 19 of that year, Greene was "jump-seating," or flying for free, on a Federal Express flight from Memphis, Tennessee to his home in Anchorage, Alaska.   [DN 50-47 at 15.] At the conclusion of that flight, FedEx security screened Greene's belongings and found a pair of small toiletry scissors.   [*Id.* at 16.]   Although Transportation Safety Administration guidelines did not ban the scissors from the flight, FedEx's internal security protocols barred their possession.   [*Id.*]   Greene was unaware that the scissors were a prohibited item.   [*Id.*]

Following the March 19 incident, FedEx security notified UPS that Greene had possessed a prohibited item and returned the scissors to Assistant Chief Pilot Jim Psiones, a supervisor at Greene's Anchorage duty station.   [*Id.* at 16-17.] Psiones returned the scissors to Greene while Greene "was in a crew room with other pilots."   [*Id.* at 17.]   Greene later claimed to UPS System Chief Pilot Roger Quinn that Psiones was confrontational during that encounter, and told Greene that a report had been filed with the TSA regarding the scissor incident.   *See* [DN 50-54 at 3-4.]   Greene later discovered, as the parties now agree, that no TSA report was ever filed.   [*Id.* at 4.]

3

Additionally, Anchorage Chief Pilot Ed Faith made a notation of the scissor incident on Greene's Exception History Report, or EHR. The EHR is a non-disciplinary part of each UPS crewmember's employment record that makes note of various occurrences during a pilot's employment. A look at Greene's own EHR reveals that most entries are relatively benign, pertaining to work absences, scheduling changes, and the like. *See* [DN 50-55.] Indeed, some EHR entries are positive in nature. *See, e.g.*, [*id.* at 1 ("[D]oug was extremely helpful to us by taking this trip out this afternoon").] The EHR notation regarding the scissor incident, however, was not positive. Faith described the incident as follows [sic throughout]:

> ups was notified by one fedex operator that during the screening process for mr. greene's requested jumpseat, a pair of scissors was discovered. this is a prohibited item! when asked about the scissors, mr. greene stated that "no one else seems to have a problem with them." the scissors were surrendered and later recovered by anc acp jim psiones. this is unacceptable behavior on the part of mr. greene and could jeopardize future jumpseat travel for ups pilots on fedex.

[*Id.* at 3.] In a separate section, Faith's EHR notation stated:

> both jim psiones and ups security rep ken murray have spoken with mr. greene. he has been advised that his actions and confrontational behavior are unacceptable and not to have it happen again. entered by anc cp ed faith. . . . in a conversation subsequently with capt. greene, he did not seem to take the issue seriously and had negative opinions on the performance of the security staff at fedex and stated he has been through there (fedex) with those scissors several times with no problems. in short, capt. greene marginalized the event and always had a response justifying his actions. capt. greene took exception to my bringing the issue forward in the crew room. it was not my intent to address the issue openly. I was left with no options once capt. greene began talking and never stopped to listen. j psiones

[*Id.*]

4

While Greene did not deny that he possessed the toiletry scissors on the FedEx flight, he felt that Faith's EHR notation did not accurately reflect the incident. Thus, Greene spent the summer of 2013 lobbying various UPS and IPA officials in an attempt to have the notation removed from his EHR. Particularly, Greene contacted Billy Cason, IPA Treasurer, and Christopher Harper, Chairman of the IPA Jump Seat Committee, seeing their help in removing the notation. *See* [DN 50-56 at 2; DN 50-62 at 2.] Under the UPS-IPA Collective Bargaining Agreement, EHR notations are not disciplinary, and therefore may not be the subject of an employment grievance. *See* [DN 50-9 at 43 ("Verbal warnings, warning letters and letters of concern which do not include loss of pay, loss of a benefit, suspension or termination shall not be considered discipline for purposes of the grievance procedure.").] Therefore, IPA did not file a grievance concerning the EHR notation on Greene's behalf, but Cason and Harper did negotiate with UPS officials concerning the notation. *See* [DN 50-56 at 2; DN 50-62 at 2.] While Cason and Harper were not successful in having the entire EHR notation removed, they did convince Chief Pilot Quinn to add the following statement [sic throughout]:

> **update 8/1/2013**ups received a letter from fedex cp jeff kilmer on june 14, 2013 acknowledging the event and that capt. greene was courtesy to his security team when the event occurred.   archive of that email is preserved.  this matter is considered closed unless further information is provided.   roger quinn system chief pilot

[DN 50-55 at 3.] Both Cason and Harper consider their efforts successful under the circumstances. *See* [DN 50-56 at 2; DN 50-62 at 2-3.] Greene, however, was

5

still unsatisfied, writing a six page letter to that effect to Chief Pilot Quinn.  *See*

[DN 50-54.]

    To address Greene's continued concerns with the EHR notation, Anchorage

Chief Pilot Faith met with Greene and Wayne Jackson, an IPA representative, on

August 22, 2013.   In a subsequent EHR notation, Faith detailed what transpired at

that meeting [sic throughout]:

> on 22 august 2013, capts: doug greene, wayne jackson and i met to
> discuss captain greene concerns with his recent exception entry.  i
> gave captain greene an opportunity to explain his side of the fedex
> story and let him know where i had received my information for the
> initial exception entry.   during the conversation it was discovered that
> captain greene was recording our conversation without my knowledge
> or approval.  when I questioned captain greene regarding his
> recording of our conversation, he stated that he recorded all his
> conversations between himself and the ipa and ups.   he stated that he
> recorded his conversation with anc security supervisor ken murray
> regarding the fedex issue without his knowledge.  captain greene
> stated that the ipa and ups were trying to get him and he would use
> the tapes to ensure his side of the story when he came after ups.   i
> told captain greene that i had received concerns from a number of
> crewmembers that he was attempting to gather information on acp jim
> psiones.  i told captain greene that the crewmembers indicated they
> were feeling harassed and intimidated and felt uncomfortable flying
> with him or speaking to him.  i asked if he was familiar with ups'
> workplace violence and harassment policies and he stated that he was
> and that he began all his conversations with a disclaimer to allow the
> crewmember to decide whether they wanted to speak to him or not.  i
> said regardless of his disclaimer, some of the crewmembers felt
> intimidated and threatened and i stated that i needed a commitment
> that he not make additional inquiries and if we received additional
> concerns from crewmembers we would have to move forward with
> formal  harassment/workplace  violence  actions.  he  stated  he
> understood.

[DN 50-55 at 3-4.]   During a later disciplinary hearing, Greene's recording of the

August 22 meeting was played and transcribed.   That transcript runs some eighty-

six pages and reveals that the bulk of that meeting consisted of Greene explaining the circumstances of the scissor incident and how, in his view, the EHR notation was inaccurate and unwarranted.   *See* [DN 50-21 at 5-91.]   Additionally, Greene references the Kentucky tax investigation and his belief that UPS and IPA officials had conspired against him and other UPS pilots.   Greene also mentions a back injury that he suffered in 1994 and re-aggravated in 2012, suggesting that he had sought medical treatment to deal with the pain.   *See* [*id.* at 52-56.]

Greene's behavior following the scissor incident, and particularly his statements to other pilots and during the August 22 meeting, caused UPS to become concerned with Greene's ability to safely function as a pilot.   UPS removed Greene from flight status on or around August 22 and notified IPA that it was investigating Greene's conduct.   [DN 50-3 at 5.]   Under Article 7.B.2, when UPS removes a pilot from flight duty, the pilot is entitled to a disciplinary hearing, at which he may be represented by IPA.   [DN 50-9 at 43.]   In the days leading up to Greene's hearing, scheduled for September 11, 2013, IPA's Executive Board decided to hire outside counsel to handle Greene's case on IPA's behalf.   [DN 50-3 at 5.] Typically, IPA members are represented by IPA staff attorneys during disciplinary proceedings, but because of Greene's acrimonious history with IPA leadership, the Board hired attorney Irwin Cutler to advocate for Greene.   [*Id.* at 6.]   While Cutler had not previously represented clients in the air cargo industry, he had extensive experience in labor and employment law, and was recognized by his peers as an outstanding attorney in his field.   [DN 50-18 at 1-2.]   The Executive Board

informed Greene of its decision to hire Cutler by letter on August 30, 2013, and copied Greene's personal attorney, Arnold Feldman. *See* [DN 50-7.]  Cutler, Feldman, and Greene met in person on September 10, 2013, to prepare for the disciplinary hearing the next day.   [DN 50-18 at 3.]

During the September 11 hearing, Greene stated that in addition to his recording of the August 22, 2013 meeting, he also possessed two additional recordings of conversations with UPS management.  [*Id*.]  Greene provided all three audio files to Feldman, who forwarded them to Cutler.  [*Id*. at 3-4.]  During a second disciplinary hearing on October 16, 2013, Greene claimed that those were the only recordings he possessed.  [*Id*. at 4.]  However, Greene later admitted that his statement during the October 16 hearing was untruthful, and that he actually recorded four conversations.  [DN 50-47 at 22-23.]

In addition to the two disciplinary hearings, UPS also received statements from other employees that raised concerns about Greene's behavior and his ability to fly safely.  Michael Starnes, one of Greene's fellow pilots, emailed Jennifer Robbins, a UPS investigator, on September 7, 2013, to follow up on a previous telephone call.  [DN 50-51 at 1.]  In his email, Starnes states that, in his opinion, Greene's behavior towards Psiones was not justified, and characterizes Greene's statements as "personal attacks."  [*Id*.]  Starnes also says that "Doug's paranoia has extend[ed] to him carrying a recording device onto UPS property and keeping files of paper with him in order to document anything that Jim [Psiones] says or does.  This to me sounds like someone who is more interested in revenge than

coming to work to fly airplanes."  [*Id.*]   Similarly, Captain Peyton Cook emailed Psiones on September 23, stating that "Captain Greene's hostile and volatile personality towards fellow crew members and UPS management jeopardizes the conduct of safe flight operations."   [DN 50-52 at 1.]

Pilot Marc McDermont also provided a statement to Robbins, on October 19, 2013.   *See* [DN 50-53.]   McDermont states that during a layover in Hong Kong in early July, he and other UPS crewmembers met Greene in the lobby of a hotel.   [*Id.* at 1.]   This was the first time McDermont and Greene had ever met.   [*Id.*] McDermont, Greene, and the other UPS crewmembers went out to dinner, during which "Captain Greene spoke quite vociferously and at great length about his interactions with the Company and the Kentucky Department of Revenue.   He stated that there was a conspiracy between UPS and the Kentucky Department of Revenue to harm him financially and to impeach his character."   [*Id.*] McDermont also tells Robbins that, during their dinner, Greene "said that UPS had hired several hit men who were associated with UPS' attorney . . . .   Captain Greene then stated that he had developed so much evidence of their plot to kill him that it had made it impossible for UPS to carry through with the assassination." [*Id.*]

Following its internal investigation and the two disciplinary hearings, UPS decided to require Greene to submit to an additional medical examination, as was its right under the CBA.   In an October 25, 2013 letter, Chief Pilot Quinn informed Greene:

> This investigation has uncovered various acts of misconduct that has provided a legitimate basis for discipline. However, the investigation has also uncovered "objective evidence indicating that you may have a medical problem which could interfere with your ability to safely function as a crewmember."

[DN 50-23 at 2.]   Quinn was quoting Article 5.D.1.a of the CBA, which provides, in pertinent part, "If there is objective evidence indicating that a crewmember has a medical problem which could interfere with his ability to safely function as a crewmember, the Company may require the crewmember to have a medical examination other than a routine FAA required physical examination." [DN 50-9 at 25.]   In response to Quinn's directive, Cutler requested that UPS provide the "objective evidence" that had caused UPS to become concerned with Greene's ability to fly. [DN 50-18 at 4.]   The next day, UPS provided Cutler with 407 pages of evidence, "consist[ing] mainly of transcripts of Greene's recorded conversations and statements that a UPS investigator had received from pilots regarding Greene's unusual behavior." [*Id.* at 4-5.]

UPS first directed Greene to see Dr. Petra Illig, an Aviation Medical Examiner based in Anchorage, on November 2, 2013. Prior to that appointment, Cutler "warned Greene and Feldman about the Company's claimed objective evidence to justify the order for an exam," telling them that an arbitrator might very well find that UPS's evidence justified an additional medical exam under the CBA. [*Id.* at 5.] Greene failed to appear for the November 2 exam. UPS scheduled another appointment for Greene with Dr. Illig on November 7, 2013, and informed Greene via email that "[f]ailure to appear will result in the immediate

termination of your employment with United Parcel Service." [DN 50-24 at 2.] Before the November 7 appointment, Cutler and Feldman exchanged several emails. *See* [DN 50-25; DN 50-26.] Those messages show that in the days leading up to the November 7 appointment, Greene and Feldman were still concerned with the propriety, purpose, and scope of the medical examination. *See* [*id.*] While Cutler stopped short of advising Greene to attend the appointment, he maintained his position that Greene would "run significant risks by refusing to take the exam." [DN 50-25 at 4.] Cutler also stated that "the Union will certainly defend Doug with regard to any decision he makes." [*Id.*] Finally, Cutler corresponded with Tony Coleman, UPS's outside counsel at the time, seeking answers to some of the questions Feldman had raised regarding the examination. [DN 50-26 at 4.] Following this colloquy, Greene did attend his appointment with Dr. Illig on November 7. [DN 50-18 at 6.] However, Greene had Feldman on speakerphone during the appointment, and eventually left without being examined. [*Id.*]

Despite UPS's earlier warning to Greene, it allowed him one more opportunity to submit to an examination. Cutler states that Greene requested, through Feldman, that he be given the weekend of November 16-17 to meet with his family to decide whether to undergo the exam. [*Id.*] Cutler relayed that request to UPS, and UPS agreed. [DN 50-27 at 2.] UPS also stated that "the only information we will seek from the examining doctor is a conclusion as to whether Doug is legally safe to return to work for UPS as a Captain. We do not need any medical details." [*Id.*] Nevertheless, Greene declined a third opportunity to be

11

examined, and Chief Pilot Quinn terminated his employment on November 22, 2013 for insubordination.   [DN 50-28 at 2.]

Following Greene's termination, IPA filed a grievance on Greene's behalf. [DN 50-18 at 6.]   In cases involving discharge, CBA Article 7.C.1 allows the grievance to proceed directly to the IPA/UPS System Board of Adjustment, comprised of two UPS-appointed members, two IPA-appointed members, and one neutral arbitrator selected from an alphabetical list.   [DN 50-9 at 44; *id.* at 49.] Initially, Arbitrator James Scearce was selected as the neutral member of the System Board, and he set the arbitration hearing for January 21, 2014.   [DN 50-18 at 7.]   On December 12, 2013, Scearce also informed UPS and IPA via email that he was suffering from macular degeneration and was "somewhat impaired at close reading."   [DN 50-29 at 2.]   Cutler admits that this email was never forwarded to Feldman or Greene.   [DN 50-18 at 7.]

During December 2013 and January 2014, Cutler claims that he and Houston Parrish, a fellow attorney at Cutler's firm, "worked with Feldman in interviewing potential witnesses, engaging in telephonic strategy sessions, viewing documents, and otherwise doing what lawyers normally do to prepare for an evidentiary hearing."   [*Id.*]   Pursuant to the CBA's discovery provisions, Cutler also requested numerous documents from UPS.   [*Id.*]   Additionally, Cutler wrote to Tony Coleman, outside counsel for UPS, on January 8, 2014, asking Coleman to recuse himself from Greene's case because of a conflict of interest.[2]   *See* [DN 50-30.]

---

[2] That conflict forms the basis of Greene's claims in *Greene v. Frost Brown Todd, LLC, et al.*, No. 3:14-CV-00619.   Greene had previously hired attorney Mark Sommer to represent him in his

Cutler states that he was not informed of the conflict until December 12, 2013, and Greene did not request that Coleman be recused until January 6, 2014.   [DN 50-18 at 7-8.]   Coleman recused himself and his firm on January 13, 2014.   [DN 50-31.]

The next day, January 14, Cutler received a call from John Klages, a Quarles & Brady attorney based in Chicago, who stated that UPS had hired him to replace Coleman.   [DN 50-18 at 8.]   Klages asked Cutler to agree to postpone the arbitration hearing, scheduled to begin a week later.   [*Id.*]   Cutler claims that he and Feldman had already discussed the possibility of postponing the hearing, and Feldman was willing to agree.   [*Id.*]   Because of his previous conversation with Feldman, and his belief that Arbitrator Scearce would grant a postponement over any objection because of the short time frame, Cutler agreed to the postponement. [*Id.*]   Later on January 14, however, Cutler received an email from Feldman, asking that IPA oppose UPS's forthcoming motion to postpone.   [DN 50-32 at 2.] Cutler declined to oppose a postponement, instead sending a letter to Klages and Scearce requesting that the arbitration be rescheduled as soon as feasible.   [DN 50-33.]   Scearce offered dates for the hearing in February, but according to Cutler, both Greene and UPS rejected those dates.   [DN 50-34.]   Cutler says that Feldman and Greene wanted to delay the hearing while they researched Arbitrator Scearce and the method by which UPS and IPA chose the neutral arbitrators.   [DN

---

Kentucky tax dispute.  When Greene originally hired Sommer, he was employed at Bingham Greenebaum Doll, but during the pendency of Greene's case, Sommer began working at Frost Brown Todd.  Sommer still represented Greene when Coleman and Frost Brown Todd were hired to represent UPS in Greene's termination proceedings.

50-18 at 9.]   Eventually, the parties settled on September 15, 2014 as the hearing

date.   [*Id.*]

While Greene's termination grievance was pending, Feldman requested that

Cutler provide him with several types of information.   First, Feldman asked for

information or documents pertaining to the IPA Professional Standards Committee.

Robert Travis, IPA President, describes the Committee in his declaration:

> The IPA Professional Standards Committee is a group of IPA member
> pilots who routinely function independently of IPA's officers.   Their
> role is to consider issues which pilots bring to them regarding other
> pilots and to attempt to resolve those issues before the matter is
> escalated or is called to UPS management's attention which may result
> in discipline.   Professional standards committees are common in the
> airline industry and perform peer-to-peer dispute resolution. . . .
> Their role is to consider the issues which pilots bring to them
> regarding other pilots and to attempt to resolve those issues before the
> matter is escalated to the Company's attention and possible discipline.
> . . .   As Professional Standards is a mechanism for pilots to address
> issues with other pilots internally and confidentially, its value depends
> on the fact that it is confidential.   The committee members keep all
> communications completely confidential and share them within the
> IPA organization strictly on a "need to know" basis.

[DN 50-3 at 6-7.]   In two letters to Feldman, Cutler explains why IPA declined to

furnish the Professional Standards Committee information: "To introduce evidence

of what has transpired (or perhaps more accurately, what has not transpired) with

Professional Standards we think unwisely opens up an area of discovery and

subpoena that functions best when its confidential nature is protected."   [DN 50-35

at 2; *see also* DN 50-36 at 3 ("Weighing the probative value of [the Professional

Standards] evidence against the risk of opening the door for UPS to dredge up

Doug's prior termination, and considering the deleterious effect it may have on the

Professional Standards program, I am not willing to introduce that evidence at the arbitration hearing.").]

Feldman also requested that Cutler provide information regarding the arbitrator selection process, and specifically how Scearce had been selected for inclusion on the list of arbitrators. [DN 50-37.] Feldman and Greene were apparently concerned with Arbitrator Scearce because of his age, and because he had previously been censured by the National Academy of Arbitrators. Cutler responded with a list of the twenty arbitrators that were currently on the UPS-IPA panel, and explained that whenever an arbitrator is needed, UPS and IPA simply select the next person on the list. [DN 50-38 at 1.] Cutler did, however, decline to provide documents relating to the formation of the arbitrator list in 2006, when the current iteration of the CBA went into effect. [DN 50-18 at 11.] Cutler told Feldman that IPA did not believe Scearce's past censure warranted disqualification, and did not respond to Feldman's concerns regarding Scearce's age. [DN 50-39 at 2-3.]

On April 3, 2014, Feldman sent a letter to Scearce, asking Scearce to recuse himself because he had issued subpoenas for UPS witnesses without notifying Feldman or Greene, and because of his past censure. [DN 50-40 at 1-2.] IPA joined Feldman's request for Scearce to withdraw on April 4. [DN 50-41 at 1.] Citing medical limitations, Scearce withdrew, [DN 50-42 at 2], and the parties selected Jack Tillem, the next arbitrator on the list, as his replacement. On July 21, 2014, Feldman filed a motion asking Tillem to withdraw, *see* [DN 50-44],

alleging that he was unqualified to hear Greene's case, [DN 50-43 at 1].   Tillem originally denied Greene's motion, [DN 50-45 at 1], but then voluntarily withdrew, stating that "the denial of [Greene's] motion cannot help but create an appearance[,] if not the reality[,] of lack of impartiality, a shroud hanging over the entire proceeding," [DN 50-46 at 1].   The next arbitrator on the list was Barry Winograd. Cutler states that Feldman "did not have a problem with Winograd because his opinions [were] better than Tillem's, not because of his experience in the airline industry."   [DN 50-18 at 12.]   Winograd ultimately presided over the arbitration hearing held on September 15-17, 2014.

In the weeks leading up to the hearing, Cutler states that he and Feldman "had many conversations . . . to discuss strategy and to prepare for the hearing." [*Id.* at 12.]   IPA arranged for Greene's witnesses to be present for the hearing at IPA's expense.   [*Id.* at 12-13.]   Ten days before the hearing, on September 5, 2014, Feldman requested that IPA completely withdraw from active participation in Greene's case.   *See* [DN 50-48.]   Specifically, Feldman asked that "IPA discontinue contacting union and company witnesses, opposing counsel and . . . the arbitrator." [*Id.* at 1.]   However, Feldman did request that Cutler "continue to promptly coordinate administrative and logistical matters," "relay messages as required," and "pay the costs it is obligated to pay."   [*Id.*]   Additionally, Feldman asked that Greene, rather than IPA, be allowed to appoint the two union representatives to sit on the System Board.   [*Id.* at 2.]

On September 8, 2014, Cutler replied to Feldman's letter.   *See* [DN 50-49.] Cutler agreed to allow Feldman to "represent Captain Greene at the hearing, to make an opening statement and closing statement or brief, present witnesses, cross-examine witnesses, make objections and motions and otherwise fully participate in the hearing."   [*Id.* at 1.]   However, Cutler reserved IPA's right to "participate fully in the hearing and the proceedings leading up to the hearing," stating that turning complete control of the arbitration over to Greene "would be an abdication of [IPA's] obligation to the membership as a whole."   [*Id.*]   Pursuant to the CBA, IPA declined to allow Greene to appoint the two union representatives to the System Board.   *See* [*id.* at 2-3.]   Apparently unsatisfied with IPA's concessions, Greene moved on September 10 to exclude IPA from the arbitration, and to be allowed to appoint the union representatives.   Arbitrator Winograd denied both of those motions.   [DN 50-50 at 2.]

On the morning of September 12, 2014, UPS delivered to Cutler's office "two boxes containing approximately 4,000 pages of documents." [DN 75-1 at 1.] Cutler notified Feldman that the documents had been delivered, [*id.* at 4], and made copies for Feldman of all the documents, [*id.* at 2].   Cutler and his staff "reviewed the documents and made extra copies of those which [they] felt were of importance or of interest."   [*Id.*]   According to Cutler, one item of interest that his office copied was the document Greene now refers to as the "Jennifer Robbins Determinate E-Mail."   [DN 63 at 23 (emphasis removed).]   In that email, Robbins tells Rob Guinn, another UPS security manager, "Just so you know, Roger [Quinn]

17

and I are on the same page that we should bring Greene back in to ask a few more questions and then determinate [sic] him due to[:] creating a hostile work environment, dishonesty and retaliation."   [Case No. 3:15-CV-00234, DN 56-2 at 1.][3]

Also on September 12, 2014, the same day that UPS delivered 4,000 pages of documents to Cutler, Greene filed the instant suit.   [DN 1.]   Greene's specific allegations are detailed below, but generally speaking, Greene claims that in handling his termination grievance, IPA violated both its duty of fair representation and certain provisions of the Labor-Management Reporting and Disclosure Act. *See generally* [*id.*]   The record is unclear as to when the suit came to IPA's attention, but in any event, Cutler and Parrish attended the arbitration hearing on September 15-17.   [DN 50-18 at 15.]   UPS called five witnesses and introduced thirty-five exhibits during the hearing.   [*Id.*]   Feldman, on Greene's behalf, called eleven witnesses, including Greene, and introduced twenty-one exhibits.   [*Id.*] IPA also introduced several additional exhibits that it felt supported Greene's case, but were not introduced by Feldman.   [*Id.*]   Following the arbitration, the parties filed post-hearing briefs and responses.   [*Id.*]   Cutler claims that after both the arbitration and the post-hearing briefing, Feldman thanked Cutler for his assistance and complimented Cutler on the quality of his work.   [*Id.*]   Cutler also states that Feldman and Greene rejected Cutler's suggestion that they offer to

---

[3] Greene refers to the Robbins email in his response to IPA's motion for summary judgment, but the email was not filed as an exhibit to his response in this case.

Arbitrator Winograd an intermediate remedy, rather than all-or-nothing termination or reinstatement.   [*Id.*]

Arbitrator Winograd issued the System Board of Adjustment's Opinion and Award on March 20, 2015.  *See* [DN 50-47.]   Both UPS-appointed System Board members voted in favor of termination, [*id.* at 58-59], and both IPA-appointed members voted in favor of reinstatement, [*id.* at 60-61].  Arbitrator Winograd broke the tie and upheld Greene's dismissal in its entirety.  He found that UPS's investigation was "sufficiently fair and thorough," [*id.* at 47], and that UPS had sufficient "objective evidence" to direct Greene to submit to an additional medical examination under the CBA, [*id.* at 50].  "Standing alone," Winograd wrote, "Captain Greene's acknowledgement of a serious back injury . . . provided objective evidence of a need for further medical examination." [*Id.*] Winograd characterized Greene's statements following the scissor incident as "unrelenting and wildly speculative in the range and nature of accusations that he lodged against ACP Psiones, the Company, the Union, and Kentucky's revenue authority, including allegations that the Company and the Union were engaged in allied action against him."   [*Id.* at 51.]   Greene's "fixation" on the EHR notation "raised a legitimate medical issue about his judgment and focus."   [*Id.*]   Winograd described Greene's conduct as "occupational self-destruction beyond the remedial authority of [the System Board]."   [*Id.* at 55.]   Finally, Winograd found "no evidence of collusion between the Company and the Union," [*id.* at 56], recognizing that there was

> ample evidence of the Union's firm and clear opposition to the Company's action, reflecting a Union interest to protect not only Greene, but the bargaining unit as a whole from unjustified medical examinations under Article 5.D.  The Union's activities with respect to this case show conscientious, skilled, and independent representation of Captain Greene throughout the investigatory process, the hearing, and after, continuing to offer evidence and objections despite hostility expressed by Captain Greene.

[*Id.*]

As previously mentioned, Greene filed this action on September 12, 2014, three days before the arbitration hearing began.  Greene alleges that IPA and five of its officers violated §§ 101(a)(2) and (5) of the Labor-Management Reporting and Disclosure Act of 1959, as well as their duty of fair representation.  [DN 1 at 1-2.] He lists three events that he claims "resulted in a marked change in Captain Greene's relationship with the IPA":

> a. The first event involved the shuffling of IPA Executive Board leadership assignments in a manner Captain Greene believed was contrary to the union's Constitution and By-laws.
>
> b. The second event was Captain Greene's public support and nomination of a candidate to oppose then IPA President Robert Travis, who subsequently won reelection.
>
> c. The third event was the IPA's decision to limit who Captain Greene could speak with and restrict what he could publish, with regard to an investigation of UPS pilots undertaken by the Kentucky Department of Revenue.

[*Id.* at 3.]  Greene claims that in retaliation for his "vocal and unabashed . . . criticism of the IPA, its leadership and its General Counsel," IPA breached its duty of fair representation and violated the LMRDA in several ways.  [*Id.* at 4.]  As

these allegations form the gravamen of Greene's claims against IPA, they are reproduced below:

> 42. In retaliation for his outspoken criticism of the IPA and his nomination of an opposing candidate, the union has refused to provide Captain Greene with the documents and information needed to properly prosecute his grievance against UPS and to defend himself in the matter of his discharge from employment by UPS and has thus violated Section [411(a)(2)] of the LMRDA.

> 43. Section [411(a)(5)] of the LMRDA safeguards union members against improper discipline.   In retaliation for his outspoken criticism of the IPA and his nomination of an opposing candidate, the union has constructively disciplined him by refusing to provide Captain Greene with the documents and information needed to properly prosecute his grievance against UPS and to defend himself in the matter of his discharge from employment by UPS.

> . . .

> 45. Refusal to permit Captain Greene to communicate with his elected representatives and appropriate union staff in preparation for his defense is a breach of the IPA's duty of fair representation and because it is in retaliation for his political speech is a violation of the LMRDA.

> 46. Refusal to disclose professional standards documents, or the absence of documents bearing directly on his case is a breach of the IPA's duty of fair representation and because it is in retaliation for his political speech is a violation of the LMRDA.

> 47. Refusal to disclose documents related to the arbitrator selection process is a breach of the IPA's duty of fair representation and because it is in retaliation for his political speech is a violation of the LMRDA.

> 48. Refusal to prosecute eleven pending grievances is a breach of the IPA's duty of fair representation and because it is in retaliation for his political speech is a violation of the LMRDA.

> 49. Refusal to assist Captain Greene in correcting his employment record is a breach of the IPA's duty of fair representation and because it is in retaliation for his political speech is a violation of the LMRDA.

50. Refusal to inform Captain Greene, either directly or through union counsel that the company intended to discharge Captain Greene hindered his and outside counsel's ability to defend Captain Greene during the investigation and was a breach of the IPA's duty of fair representation and because it is in retaliation for his political speech is a violation of the LMRDA.

51. Assisting Mr. McDermont, a member of the bargaining unit, to file false, misleading and defamatory statements against Captain Greene was a breach of the IPA's duty of fair representation and because it is in retaliation for his political speech is a violation of the LMRDA.

52. Withholding disqualifying information regarding the arbitrator's health from Captain Greene was a breach of the IPA's duty of fair representation and because it is in retaliation for his political speech is a violation of the LMRDA.

[*Id.* at 7-9.]

When Greene filed his complaint, he was represented by Feldman as well as local counsel. Feldman moved to withdraw on November 19, 2015, [DN 25], and the Court granted that motion on December 9, 2015, [DN 29]. Since that time, Greene has proceeded *pro se*. Currently ripe for adjudication before the Court are: Defendants' motion for summary judgment, [DN 50]; Defendants' motion to dismiss pursuant to Rule 37(b), or in the alternative, to compel discovery responses, [DN 51]; Defendants' motion for sanctions, [DN 54]; Defendants' motion for temporary restraining order, [DN 55]; Defendants' motion for reconsideration, [DN 62]; and Defendants' motion for leave to file excess pages, [DN 74]. Both dispositive motions have been fully briefed, and the time for filing responses and replies for all other motions has passed. These matters are now ripe for adjudication.

## II. Discussion

### A. IPA's Motion for Summary Judgment

(1) *Standard of Review*

Summary judgment is appropriate when the record, viewed in the light most favorable to the nonmoving party, reveals "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists where "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). The Court "may not make credibility determinations nor weigh the evidence when determining whether an issue of fact remains for trial." *Laster v. City of Kalamazoo*, 746 F.3d 714, 726 (6th Cir. 2014) (citing *Logan v. Denny's, Inc.*, 259 F.3d 558, 566 (6th Cir. 2001); *Ahlers v. Schebil*, 188 F.3d 365, 369 (6th Cir. 1999)). "The ultimate question is 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Back v. Nestlé USA, Inc.*, 694 F.3d 571, 575 (6th Cir. 2012) (quoting *Anderson*, 477 U.S. at 251–52).

As the party moving for summary judgment, IPA must shoulder the burden of showing the absence of a genuine dispute of material fact as to at least one essential element of Greene's claims. Fed. R. Civ. P. 56(c); see *Laster*, 746 F.3d at 726 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)). Assuming IPA satisfies its burden of production, Greene "must—by deposition, answers to

interrogatories, affidavits, and admissions on file—show specific facts that reveal a genuine issue for trial." *Laster*, 746 F.3d at 726 (citing *Celotex Corp.*, 477 U.S. at 324).

(2) *Greene's Duty of Fair Representation Claim*

Greene first alleges that Independent Pilots Association breached its duty of fair representation in its handling of Greene's employment grievances against UPS. *See generally* [DN 1.]   In order to prevail on this claim, Greene must show that in handling his termination proceedings, IPA acted arbitrarily, discriminatorily, or in bad faith.   *Vaca v. Sipes*, 386 U.S. 171, 190 (1967).   Additionally, Greene must prove that if IPA had not acted in such a manner, the outcome of his arbitration would likely have been different.   *See Black v. Ryder/P.I.E. Nationwide, Inc.*, 15 F.3d 573, 585 (6th Cir. 1994).   In handling member grievances, the law affords unions a great deal of discretion, and IPA exercised that discretion in a reasonable manner throughout the course of Greene's termination.   Greene presents no evidence demonstrating that IPA acted arbitrarily, discriminatorily, or in bad faith, or that he could have ever been successful pursuing his termination grievance. Therefore, Defendants are entitled to summary judgment on Greene's first claim.

In *Greene v. IPA/UPS System Board of Adjustment*, No. 3:15-CV-00234, this Court upheld the System Board's Award as valid under the Railway Labor Act. Normally, binding arbitration under the RLA is just that – binding.   The RLA provides only a narrow scope of review, and permits a reviewing court to overturn an arbitration in only limited circumstances.   *See* 45 U.S.C. § 153 First (q).

"Subject to [that] very limited judicial review, [the employee] will be bound by the result according to the finality provisions of the [collective bargaining] agreement." *DelCostello v. Int'l Bhd. of Teamsters*, 462 U.S. 151, 164 (1983) (citations omitted). However, a union's violation of its duty to fairly represent an employee during disciplinary proceedings seems to provide an exception to this rule.   In *DelCostello*, the Supreme Court stated that "when the union . . . acts in such a discriminatory, dishonest, arbitrary, or perfunctory fashion as to breach its duty of fair representation . . . an employee may bring suit against both the employer and the union, notwithstanding the outcome or finality of the grievance or arbitration proceeding." *Id.* (citations omitted).   In other words, "[t]he union's breach of duty relieves the employee of an express or implied requirement that disputes be settled through contractual grievance procedures; if it seriously undermines the integrity of the arbitral process the union's breach also removes the bar of the finality provisions of the contract."   *Hines v. Anchor Motor Freight, Inc.*, 424 U.S. 554, 567 (1976).   Thus, the final, binding RLA arbitration that adjudicated Greene's termination grievance, upheld by this Court, does not bar Greene's duty of fair representation suit against IPA.

A union's duty to fairly represent its members was first announced by the Supreme Court in *Steele v. Louisville & Nashville Railroad*, 323 U.S. 192 (1944). In that case, which also arose under the Railway Labor Act, the Brotherhood of Locomotive Firemen and Enginemen and the railroad amended their collective bargaining agreement to exclude African-American railroad firemen from

employment.   *Id.* at 194-96.   The Supreme Court held that, in passing the Railway Labor Act, Congress intended "to impose on the bargaining representative . . . the duty to exercise fairly the power conferred upon it on behalf of all those for whom it acts, without hostile discrimination against them."   *Id.* at 202-03.

*Steele* imposed the duty of fair representation upon the union in the context of a contract negotiation, but the Court later extended that duty to apply in employee discipline cases.   *Vaca* 386 U.S. at 186 (1967).   In *Vaca v. Sipes*, the Court held that a union did not breach its duty of fair representation when it declined to pursue an employee's discharge grievance to arbitration, after the union concluded the employer had sufficient medical evidence to justify its decision.   *Id.* at 194-95.   The *Vaca* Court set out the circumstances under which a union violates its duty of fair representation.   "A breach of the statutory duty of fair representation occurs only when a union's conduct toward a member of the collective bargaining unit is arbitrary, discriminatory, or in bad faith."   *Id.* at 190.

Most commonly, questions regarding a union's violation of its duty arise in the context of a hybrid claim under § 301 of the Labor Management Relations Act, 29 U.S.C. § 185.   Under that statute, an aggrieved employee may sue at the same time both his employer, for violating the collective bargaining agreement, and his union, for failing to fairly represent him.   To prevail on a LMRA § 301 hybrid claim, the employee must prove not only that the union breached its duty, but also that the employer breached the collective bargaining agreement.   *DelCostello*, 462 U.S. at 165 (1983).   These two claims are "'inextricably interdependent,' and the

employee must prove both in order to recover from either defendant." *Lyon v. Yellow Transp., Inc.*, 379 F. App'x 452, 454 (6th Cir. 2010) (quoting *DelCostello*, 462 U.S. at 165) (internal citation omitted).   In this case, Greene has not brought a true hybrid § 301 claim, because he has chosen to sue only his union, Independent Pilots Association.   To recover against IPA, Greene need not also sue UPS.   *See id.* ("[A]n employee may choose to sue one defendant and not the other.").   However, Greene's choice to sue only IPA does not absolve him of his burden to prove both that IPA "handled his grievance 'in such a discriminatory, dishonest, arbitrary, or perfunctory fashion as to breach its duty of fair representation,'" and that UPS breached the CBA.   *Id.* at 455 (quoting *DelCostello*, 462 U.S. at 164).   Because Greene cannot show that IPA breached its duty of fair representation, the Court need only analyze the first aspect of Greene's fair representation claim.

To prevail against IPA, Greene must first prove that IPA acted arbitrarily, discriminatorily, or in bad faith.   *Vaca*, 386 U.S. 171, 190 (1967).   However, the Supreme Court has concluded that Congress did not intend for a federal court to replace the union's decisions with its own.   Thus, "[a]ny substantive examination of a union's performance . . . must be highly deferential."   *Air Line Pilots Ass'n, Int'l v. O'Neill,* 499 U.S. 65, 78 (1991); *see also Nida v. Plant Protection Ass'n Nat'l,* 7 F.3d 522, 526 (6th Cir. 1993).   While a gross mistake or inaction without a reasonable explanation may demonstrate a breach of the union's duty, *Poole v. Budd Co.*, 706 F.2d 181, 184 (6th Cir. 1983), mere negligence or errors in judgment are not enough, *Walk v. P*I*E Nationwide, Inc.*, 958 F.2d 1323, 1326 (6th Cir.

1992).   "An unwise or even an unconsidered decision by the union is not necessarily an irrational decision."   *Id*.   Mere "[c]onclusory allegations of discrimination are insufficient" to maintain an action against a union for breach of its duty of fair representation; rather, "an affirmative showing that the Union's action or inaction was motivated by bad faith is required."   *Whitten v. Anchor Motor Freight, Inc.,* 521 F.2d 1335, 1341 (6th Cir. 1975).

Additionally, if indeed the union did breach its duty of fair representation, the plaintiff must prove that the breach mattered in some appreciable way.   The Sixth Circuit has concluded that a breach of duty is only actionable if there is a "direct nexus" between the breach and the resulting injury.   *Wood v. Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen and Helpers of Am., Local 406*, 807 F.2d 493, 502 (6th Cir. 1986).   In other words, "the plaintiff must meet the onerous burden of proving that the grievance process was 'seriously flawed by the union's breach of its duty to represent employees honestly and in good faith.'"   *Black*, 15 F.3d at 585 (quoting *Hines*, 424 U.S. at 570) (emphasis removed).   "Thus, if a union fails to present favorable evidence during the grievance process, this failure may constitute a breach of its duty only if that evidence probably would have brought about a different decision."   *Id*. (citing *Taylor v. Ford Motor Co.*, 866 F.2d 895, 898-99 (6th Cir. 1989)).   To ultimately prevail against IPA, then, Greene must prove not only that IPA breached its duty of fair representation, but also that his employment grievance would have been successful had that breach not occurred.   With an eye

28

toward the deference due to the union's decision-making, the Court must now evaluate the propriety of IPA's conduct during Greene's disciplinary proceedings.

First, Greene may show that IPA breached its duty of fair representation by acting arbitrarily. *Vaca v. Sipes*, 386 U.S. 171, 190 (1967). "[A] union's actions are arbitrary only if, in light of the factual and legal landscape at the time of the union's actions, the union's behavior is so far outside a 'wide range of reasonableness,' as to be irrational." *Air Line Pilots Ass'n, Int'l v. O'Neill,* 499 U.S. 65, 67 (1991) (quoting *Ford Motor Co. v. Huffman,* 345 U.S. 330, 338 (1953)) (citation omitted). Mere negligence on the part of the union will not suffice, nor will ordinary mistakes, errors, or flaws in judgment. *Garrison v. Cassens Transp. Co.*, 334 F.3d 528, 538 (6th Cir. 2003) (citations omitted). "[A]n unwise or even an unconsidered decision by the union is not necessarily an irrational decision." *Id.* (quoting *Walk v. P\*I\*E Nationwide, Inc.*, 958 F.2d 1323, 1326 (6th Cir. 1992)). Instead, the plaintiff must show that the union's actions were "wholly irrational." *O'Neill,* 499 U.S. at 78. And while a union's duty includes undertaking a "reasonable investigation," *Black v. Ryder/P.I.E. Nationwide, Inc.*, 15 F.3d 573, 585 (6th Cir. 1994), that duty "does not require a union to exhaust every theoretically available procedure simply on the demand of a union member," *St. Clair v. Local Union No. 515 of the Int'l Bhd. of Teamsters,* 422 F.2d 128, 130 (6th Cir. 1969) (citing *Vaca,* 386 U.S. at 192).

The Sixth Circuit addressed a close case of arbitrariness in *Walk v. P\*I\*E Nationwide, Inc.* Walk, a dockworker and truck driver, was discharged from his

employment after he tested positive for marijuana. 958 F.2d at 1325. After unsuccessfully pursuing grievance procedures under the collective bargaining agreement, Walk brought suit against his employer and the International Brotherhood of Teamsters. *Id*. Walk alleged, among other things, that the union failed to fairly represent him because it neglected to raise a chain of custody issue that existed with respect to his urine sample. *Id*. The Sixth Circuit acknowledged that, had Walk's union representative adequately investigated the case before the arbitration, he may have learned of the chain of custody issue. *Id*. at 1329. Furthermore, the court suggested that a defect in the chain of custody might have been grounds for setting aside Walk's discharge. *Id*. Nevertheless, the court concluded that although the union's failure to pursue the chain of custody issue presented "a very close question," the failure "was more of an omission or oversight [and] a negligent error of judgment that was not directed against plaintiff capriciously or in bad faith." *Id*.

In this case, Greene alleges that IPA acted arbitrarily when it "refused to enforce Federal Law in accordance with the Railway Labor Act (RLA) & the Labor Management Reporting and Disclosure Act (LMRDA) by enforcing the Plain Language of the Collective Bargaining Agreement by insisting a Duty of Fair Representation demanding that the Plaintiff's Grievances were heard." [DN 63 at 21 (capitalization in original).] This conclusory statement is not especially helpful to the Court in determining which of IPA's specific actions Greene considers to be arbitrary. Looking at the allegations contained in Greene's complaint, however,

IPA did make some decisions in its handling of Greene's termination that arguably affected Greene negatively.   But none of those decisions fell "so far outside a wide range of reasonableness as to be irrational." *O'Neill,* 499 U.S. at 67 (internal quotation marks and citation omitted).

IPA hired outside counsel to handle Greene's termination proceedings rather than using in-house counsel.   According to IPA President Robert Travis, "IPA's normal procedure was to provide a member who is under investigation with representation by an IPA staff attorney." [DN 50-3 at 5.]   However, IPA's Executive Board "decided that that procedure was not appropriate because Greene had expressed no confidence in [IPA's] legal staff and because of the untrue, inappropriate, verbally abusive and potentially threatening statements Greene had made" during his previous conflicts with IPA.   [*Id.*]   IPA chose an experienced labor attorney with distinguished credentials in his field, Irwin Cutler, to handle its advocacy of Greene.   Given Greene's contentious history with IPA, this decision was reasonable.   Furthermore, throughout this case, Greene has alleged that IPA and its officers conspired with UPS to have him terminated.   Greene cannot maintain those allegations and, at the same time, argue that the very persons who sought his discharge acted arbitrarily by handing off his case to outside counsel. By hiring Cutler to handle Greene's termination, IPA sought to place Greene's case in the hands of a competent, neutral third-party attorney unburdened by the baggage of IPA's past relationship with Greene.

31

IPA also refused to disclose certain documents pertaining to the Professional Standards Committee and the original formation of the arbitrator selection process. As Travis explained, Professional Standards is a union body that mediates disputes between pilots.  [DN 50-3 at 6-7.]  IPA's policy is to keep all information shared with Professional Standards confidential.  [*Id.* at 7.]  Indeed, IPA believes that Professional Standards derives its value from its confidentiality; if pilots knew that the information they share with the committee might become public during a subsequent arbitration, they might be less inclined to make use of its dispute resolution processes.  [*Id.*]  As the labor representative of thousands of pilots, not just Captain Greene, IPA must sometimes favor the needs of the many over the needs of a few.  *See O'Neill*, 499 U.S. at 81.  IPA made a reasoned choice that disclosing the Professional Standards documents created a risk to the program that was greater than the value of the documents in Greene's hands.  Similarly, IPA declined Greene's request for documents pertaining to the original formation of the arbitrator list that occurred years earlier.  At the time Greene, through Feldman, made that request, he did not provide any explanation as to how those documents would prove relevant or helpful.  IPA's decision to not disclose these documents was reasonable under the circumstances, and therefore, this Court may not second-guess those decisions.

Perhaps Greene's most meritorious allegation is that IPA refused to process eleven of his pre-hearing grievances.  Those grievances, and IPA's reasons for refusing to prosecute them, are detailed in Travis's declaration.  *See* [DN 50-3 at 8-

9.]   The grievances pertain to Greene's removal from flight status, the EHR notation, statements UPS made in its communications with Greene, UPS's directive requiring Greene to submit to the additional medical exam, and pre-hearing discovery and procedural matters.   *See* [*id.*]   Travis states that "IPA did not withdraw any of these grievances but, with UPS's concurrence, held them in abeyance so that, after the arbitration award on his termination grievance, if any of those grievances had merit and were not remedied by an arbitrator's award, IPA could still pursue them."   [*Id.* at 9.]   IPA further argues that it had "good reasons to hold each of these grievances in abeyance and instead to focus its energy on the big issues – defending [Greene] in the Company's investigation of his behavior and later attempting to show that the Company did not have 'objective evidence' to justify its order for a medical exam."   [DN 50-1 at 34.]   The Court agrees. Whether or not Greene's preliminary grievances had merit, they would ultimately have been subsumed by the System Board's adjudication of Greene's termination grievance.   In other words, even if IPA had pursued Greene's eleven preliminary grievances, his termination grievance would still have proceeded to arbitration. IPA fully prosecuted Greene's termination grievance, the one that mattered.   Its decision to hold Greene's other grievances in abeyance was not "wholly irrational," *O'Neill,* 499 U.S. at 78, and was therefore not arbitrary.

Similarly, Greene's remaining allegations of arbitrary conduct are unsupported by any substantive evidence.   His complaint alleges that IPA refused to assist him in correcting his employment record.   [DN 1 at 8.]   But that is simply

33

not the case.   Both Billy Cason and Christopher Harper negotiated with UPS officials on Greene's behalf to have the EHR notation changed or removed.   *See* [DN 50-56 at 2; DN 50-62 at 2.]   Their efforts are reflected in the EHR notation itself, which contains an addendum added by Chief Pilot Quinn.   [DN 50-55 at 3.] Greene claims that the IPA refused to inform him that UPS intended to discharge him, and that this refusal hindered his ability to defend himself during the investigation.   [DN 1 at 9.]   This claim relates to Greene's allegation that Thomas Kalfas, IPA secretary and a defendant in this suit, "stated [to Peyton Cook] that Captain Greene would be losing his job" more than two months prior to Greene's termination.   [*Id.* at 5-6.]   Kalfas admits that he and Cook had a telephone conversation regarding the statement Cook planned to give UPS regarding Greene's behavior, but denies telling Cook that Greene was going to be terminated.   [DN 50-58 at 2-3.]   Greene has provided no evidence that Kalfas ever made this statement, nor has he explained how his knowledge of the statement would have mattered in his, Feldman's, or Cutler's handling of his case.

Greene states that IPA assisted Marc McDermont in filing a false, misleading, and defamatory statement against him.   [DN 1 at 9.]   Apparently, before McDermont provided his statement to UPS, he contacted IPA staff attorney Carrie James.   [DN 50-63 at 1.]   James states that she "advised [McDermont] about his obligations to cooperate with a Company investigation [and] advised him that any statement he made should be factual and completely accurate."   [*Id.*] Again, Greene brings forth no affirmative evidence showing that James or any other

34

IPA official counseled or assisted McDermont in making a false statement. Finally, Greene alleges that IPA withheld disqualifying information about Arbitrator Scearce's health. [DN 1 at 9.] Cutler admits that he never forwarded the email that mentioned Scearce's eyesight issues to Feldman or Greene, attributing his failure to "inadvertence." [DN 50-18 at 7.] Greene has provided no proof that Cutler intentionally withheld Scearce's email. At most, Cutler's failure to pass along his knowledge of Scearce's minor health issue was negligent, and mere negligence cannot be the basis for arbitrary conduct in the duty of fair representation context. *Walk*, 958 F.2d at 1329.

Even if Greene's allegations were supported by evidence and amounted to arbitrary conduct, Greene must also show a "direct nexus" between IPA's actions or inactions and his ultimate termination. *Wood v. Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen and Helpers of Am., Local 406*, 807 F.2d 493, 502 (6th Cir. 1986). This is a bridge too far. For example, Greene does not explain how his case would have been decided differently had IPA's in-house counsel, rather than Cutler, handled the case. Furthermore, even if IPA had chosen to prosecute Greene's numerous pre-hearing grievances, Arbitrator Winograd would have eventually been called upon to decide whether Greene's termination was justified under the CBA. Greene brings forth no evidence demonstrating that, had those grievances been pursued, Winograd would have reached a different decision. Similarly, even if McDermont's statement to UPS was completely false, it would not have made a difference in the outcome. Arbitrator Winograd wrote that

"[s]tanding alone, Captain Greene's acknowledgement of a serious back injury . . . provided objective evidence of a need for further medical examination."   [DN 50-47 at 50.]   This statement also forecloses the possibility that the Professional Standards Committee documents could have made an outcome-determinative difference.   Greene's objective in seeking the Professional Standards documents was to show that his fellow pilots had not complained about his behavior, presumably to rebut the statements that UPS received from Starnes, Cook, and McDermont.   But as Arbitrator Winograd's above-quoted passage reveals, Greene's own statements, rather than the allegations of other pilots, were ultimately responsible for his discharge.   Finally, any complaints Greene may have had concerning Arbitrator Scearce's health or the arbitrator selection process are immaterial.   After successfully removing two arbitrators, Greene, through his attorney, agreed that Winograd was a satisfactory choice.

During the course of its advocacy for Greene, IPA necessarily had to make decisions regarding the proper course of action.   Those decisions are entitled to substantial deference, and may constitute a breach of IPA's duty of fair representation only if they were arbitrary.   As explained above, they were not. Because Greene hired outside counsel to represent him during his termination proceedings, as was his right, IPA took on a supporting role, assisting Feldman and Greene and acting as a conduit between them and UPS.   None of the decisions IPA made while fulfilling this role can be fairly characterized as "wholly irrational," *O'Neill,* 499 U.S. at 78, and thus IPA did not act arbitrarily.

Greene might also show that IPA breached its duty by acting in a discriminatory manner. *Vaca v. Sipes*, 386 U.S. 171, 190 (1967). To show discriminatory conduct sufficient to establish a breach of the union's duty, a plaintiff must come forward with "substantial evidence of discrimination that is intentional, severe, and unrelated to legitimate union objectives." *Amalgamated Ass'n of Street, Electric Ry. & Motor Coach Emps. of Am. v. Lockridge,* 403 U.S. 274, 301 (1971). Standing alone, mere differential treatment of two employee groups does not constitute discrimination in this context. *See Air Line Pilots Ass'n, Int'l v. O'Neill*, 499 U.S. 65, 81 (1991).

Most commonly, allegations of discrimination in the fair representation context arise when a union favors one group of employees over another for purposes of seniority after a strike or merger. *See, e.g.*, *id.* (citing *NLRB v. Erie Resistor Corp.*, 37 U.S. 221 (1963); *Trans World Airlines, Inc. v. Flight Attendants*, 489 U.S. 426 (1989)). Presumably, a union could also violate its duty by discriminating against individual members on the basis of a protected characteristic, such as race. *See Steele v. Louisville & Nashville Railroad*, 323 U.S. 192 (1944). At the very least, a successful plaintiff would have to show that his union had no legitimate basis for treating him differently than a comparable employee.

Here, Greene presents no facts suggesting IPA discriminated against him in any appreciable way. Greene does not allege that he is a member of a protected class, or that IPA treated him differently because of his membership in that class. Nor has Greene shown that IPA represented him less vigorously than any other

similarly-situated union member.   In his response, Greene does make some vague allegations of discrimination by IPA.   For instance, he states, "UPS has knowingly discriminated against me by singling me out with Unreasonable and Arbitrary actions they have not done to other crewmembers (i.e. Bob Allen & others over Exception History entries, security and UPS manufactured disciplinary actions)." [DN 63 at 11 (emphasis removed); *see also id.* at 21; *id.* at 29; *id.* at 70.]   But Greene brings forth no evidence demonstrating who Bob Allen (later referred to as Bill Allen, [*id.* at 21]) is, what Allen was accused of, and how IPA treated him differently than Greene.   Because he has failed to make even a minimal showing of discrimination, Greene presents no genuine issue of material fact with respect to this prong of his duty of fair representation claim.

Finally, Greene can prove breach by showing that IPA acted in bad faith in its handling of his disciplinary proceedings. *Vaca v. Sipes*, 386 U.S. 171, 190 (1967). The Sixth Circuit has characterized "bad faith" as actions lacking "complete good faith and honesty of purpose in the exercise of its discretion." *Apperson v. Fleet Carrier Corp.,* 879 F.2d 1344, 1355 (6th Cir. 1989) (quoting *Hines v. Anchor Motor Freight, Inc.,* 424 U.S. 554, 564 (1976)).   To demonstrate bad faith, a plaintiff must come forward with "evidence of fraud, deceitful action, or dishonest conduct."   *Summers v. Keebler Co.*, 133 F. App'x 249, 253 (6th Cir. 2005) (citing *Humphrey v. Moore,* 375 U.S. 335, 348 (1964)).

This is where the heart of Greene's duty of fair representation claim now lies. Indeed, in his response to IPA's motion for summary judgment, the word "fraud" or

one of its derivations appears 131 times in Greene's 92-page filing.   *See* [DN 63.]
However, conclusory allegations of fraud are insufficient to demonstrate that IPA
acted in bad faith.   Rather, Greene must back up his accusations of fraud with
substance, bringing forth affirmative evidence that IPA engaged in misconduct.
*See Whitten v. Anchor Motor Freight, Inc.,* 521 F.2d 1335, 1341 (6th Cir. 1975).

In his response, Greene lists eight specific ways in which IPA acted in bad
faith.   *See* [DN 63 at 22-25.]   Generally speaking, Greene alleges that IPA either
violated or allowed UPS to violate certain provisions of the CBA.   *See* [*id.*]   But
the evidence of record demonstrates that, rather than allowing UPS to freely violate
the CBA, IPA assisted Greene's personal counsel in pursuing his termination
grievance to arbitration, as the CBA required it to do.   IPA and Greene may have
had disagreements during UPS's investigation and subsequent discharge of Greene.
But IPA has shown, and Greene has not rebutted, that IPA's decisions were
motivated by a desire to assist Greene to the fullest possible extent, while still
protecting the interests of the union membership as a whole.

Undoubtedly, some degree of animosity exists between the parties to this
case.   But mere ill will is not enough to prove that IPA acted in bad faith.   As the
Sixth Circuit has stated:

> Not all members of the same union are necessarily personal friends.
> They may even be personal rivals—bearing ordinary human jealousies
> and conflicting goals.   Such personal differences may be evidence that
> a union officer was hostile to a particular union member.   This
> personal hostility may even be the first step in an employer's discipline
> against a bargaining unit employee.   Personal hostility is not enough,
> however, to establish a *prima facie* case of unfair representation in a
> union member's discharge if the union's representation during the

> disciplinary steps is adequate and there is no evidence that the personal hostility tainted the arbitrators' decision.

*VanDerVeer v. United Parcel Serv., Inc.*, 25 F.3d 403, 405 (6th Cir. 1994) (citation omitted).   Given Greene's inflammatory rhetoric both prior to and during this case, it would not be altogether unsurprising if certain IPA members harbor animosity towards Greene.   But to establish that IPA acted in bad faith, thereby breaching its duty of fair representation, Greene must do more than make bare allegations of fraud and personal hostility.   Faced with IPA's motion for summary judgment, supported by record evidence, Greene must demonstrate that IPA's, not UPS's, actions towards him were motivated by that hostility, and that the arbitrator's decision was tainted as a result.   He has not done so.   After receiving testimony and evidence over the course of a three-day hearing, Arbitrator Winograd concluded that IPA engaged in "firm and clear opposition to the Company's action . . . .   The Union's activities with respect to this case show conscientious, skilled, and independent representation of Captain Greene throughout the investigatory process, the hearing, and after."   [DN 50-47 at 56.]   The Court agrees.

In sum, Greene presents no genuine issue of material fact with respect to his duty of fair representation claim against IPA and its officers.   IPA has demonstrated that, at every step of its advocacy on Greene's behalf, it acted reasonably and in good faith.   Granted, IPA did not agree with Greene and his personal counsel on every decision.   But the law does not require IPA to unquestionably follow Greene's commands.   Rather, IPA must be afforded substantial deference in its decision-making, and will be liable for breaching its

40

duty of fair representation only when it acts arbitrarily, discriminatorily, or in bad faith.   *Vaca*, 386 U.S. at 190.   Greene brings forth no evidence demonstrating that IPA acted in such a way, nor does he show that the outcome of his arbitration would likely have changed had IPA acted differently.   Therefore, Defendants are entitled to summary judgment on Greene's duty of fair representation claim.

(3) *Greene's LMRDA Claims*

Greene's second set of claims arises under the Labor-Management Reporting and Disclosure Act, 73 Stat. 519, *as amended*, 29 U.S.C. § 401 *et seq.*   That Act, among other things, prevents labor unions from retaliating against union members who exercise their free speech right to speak out against the union.   However, in a civil suit against a union under the LMRDA, the employee must show that he was subjected to the union's formal disciplinary procedures, rather than ad hoc retaliation by individual union members.   Here, Greene was never disciplined by IPA in the manner contemplated by the LMRDA, so his claims under the Act must fail.

Passed in 1959, Title I of the LMRDA, 29 U.S.C. §§ 411-415, is entitled "Bill of Rights of Members of Labor Organizations."   The LMRDA "was the product of congressional concern with widespread abuses of power by union leadership." *Finnegan v. Leu*, 456 U.S. 431, 435 (1982).   When it was enacted, Title I "placed emphasis on the rights of union members to freedom of expression without fear of sanctions by the union . . . .   Such protection was necessary to . . . ensur[e] that unions would be democratically governed and responsive to the will of their

41

memberships." *Id*. at 435-36.   Here, Greene relies upon §§ 101(a)(2) and (5) of the

Act, 29 U.S.C. §§ 411(a)(2) and (5), which provide:

> Every member of any labor organization shall have the right to meet and assemble freely with other members; and to express any views, arguments, or opinions; and to express at meetings of the labor organization his views, upon candidates in an election of the labor organization or upon any business properly before the meeting, subject to the organization's established and reasonable rules pertaining to the conduct of meetings: *Provided,* That nothing herein shall be construed to impair the right of a labor organization to adopt and enforce reasonable rules as to the responsibility of every member toward the organization as an institution and to his refraining from conduct that would interfere with its performance of its legal or contractual obligations.

29 U.S.C. § 411(a)(2).

> No member of any labor organization may be fined, suspended, expelled, or otherwise disciplined except for nonpayment of dues by such organization or by any officer thereof unless such member has been (A) served with written specific charges; (B) given a reasonable time to prepare his defense; (C) afforded a full and fair hearing.

*Id.* § 411(a)(5).   Furthermore, LMRDA § 609, 29 U.S.C. § 529, states that "[i]t shall

be unlawful for any labor organization . . . to fine, suspend, expel, or otherwise

discipline any of its members for exercising any right to which he is entitled under

the provisions of [Title I]."

To establish liability under either LMRDA § 101(a)(2) (through § 609) or §

101(a)(5), an aggrieved employee must prove that he was "fine[d], suspend[ed],

expel[led], or otherwise discipline[d]."   While the first three types of punishment

are self-explanatory, the fourth is not.   Helpfully, both the Supreme Court and the

Sixth Circuit have addressed the meaning of "otherwise discipline" in the context of

the LMRDA.   In *Breininger v. Sheet Metal Workers International Association Local*

42

*Union No. 6*, the Court considered the case of a worker who alleged that his union, which operated a hiring hall and referral list, refused to recommend his services to prospective employers in retaliation for his political activities within the union. 493 U.S. 67, 71-73 (1989).   The plaintiff claimed that the union's failure to recommend him to employers constituted discipline within the meaning of LMRDA §§ 101(a)(5) and 609.   *Id*. at 72.   The Court disagreed, holding that "by using the phrase 'otherwise discipline,' Congress did not intend to include all acts that deterred the exercise of rights protected under the LMRDA, but rather meant instead to denote only punishment authorized by the union as a collective entity to enforce its rules."   *Id*. at 91.   Applying the *ejusdem generis* canon of statutory construction, the Court recognized that "the specifically enumerated types of discipline—fine, expulsion, and suspension—imply some sort of established disciplinary process rather than ad hoc retaliation by individual union officers." *Id*. at 91-92.   Because the plaintiff "was not punished by any tribunal, nor was he the subject of any proceedings convened by [the union][,]" he could not maintain an action under LMRDA §§ 101(a)(5) and 609.   *Id*. at 94.

The Sixth Circuit has twice addressed the *Breininger* Court's definition of "otherwise discipline," first in *United Food and Commercial Workers International Union Local 911 v. United Food and Commercial Workers International Union*, 301 F.3d 468 (6th Cir. 2002).   There, a grocery workers' union had a collective bargaining agreement with a number of Meijer grocery stores.   *Id*. at 471-72. After negotiations to renew the CBA fell through, the union's local chapter, Local

911, wanted to boycott Meijer, but the international union overruled its request for a boycott. *Id*. at 472. Subsequently, Local 911 requested that the workers of a newly-constructed Meijer store be assigned to its jurisdiction, but the international union assigned the workers to a different chapter. Local 911 sued the international union under LMRDA §§ 101(a)(2) and (5), but the Sixth Circuit upheld the district court's dismissal of these counts. With respect to Local 911's § 101(a)(5) claim, the court held that the international union's denial of jurisdiction "did not result from an established union disciplinary process," and therefore was "much closer to ad hoc retaliation than to 'punishment authorized by the union as a collective entity to enforce its rules.'" *Id*. at 747 (quoting *Breininger*, 493 U.S. at 91-92)).

Similarly, in *Webster v. United Auto Workers, Local 51*, the Sixth Circuit held that the union had not disciplined the plaintiff within the meaning of LMRDA § 101(a)(2). 394 F.3d 436, 441 (6th Cir. 2005). In that case, Webster, an elected union official, alleged that he was subjected to retaliation after publicly stating that "International Auto Workers had 'sold out' the membership." *Id*. at 439. The district court granted summary judgment in favor of the union, determining that Webster's allegations of "concerted activity to disparage [him] to the membership and to deny him the right to challenge this concerted activity within the context of a union hearing[]" were insufficient to constitute "discipline" under the LMRDA. *Id*. at 440-41. The Sixth Circuit agreed, observing that Webster "present[ed] no evidence to show that the alleged treatment of him was authorized by a collective

entity to enforce its rules or that it resulted from an established union disciplinary process." *Id*. at 441.   Rather, Webster "was the target of the kind of ad hoc retaliation by individual union officials that is not subject to the protections of the Act." *Id*.   *See also Konen v. Int'l B'hood. of Teamsters, Local 200*, 255 F.3d 402, 410 (7th Cir. 2001) (plaintiff was "never subjected to official Union discipline . . . and there [was] no evidence that his membership rights or status [had] been diminished in any way").

Faced with this precedent, the record is devoid of any actions taken by IPA that would constitute prohibited conduct under the LMRDA.   IPA never sought to fine, suspend, or expel Greene, so the only way Greene may prevail under the LMRDA §§ 101(a)(2) and (5) is to show that he was "otherwise disciplined."   He cannot.   The actions taken by IPA that Greene details in his complaint all involve decisions IPA made during the course of its representation of Greene during his UPS termination proceedings.   *See* [DN 1 at 7-9.]   IPA's choices regarding the proper handling of Greene's dispute with UPS were procedural, not punitive, in nature.   And while Greene was subjected to formal disciplinary proceedings that ultimately resulted in his discharge, those proceedings were instituted by UPS, not IPA.   Regardless of their propriety, UPS's actions towards Greene cannot form the basis of IPA's liability to Greene under the LMRDA, when IPA as an entity took no disciplinary action towards him. Because Greene "was not punished by any tribunal, nor was he the subject of any proceedings convened by [the union]," he

cannot maintain his claims against IPA under LMRDA §§ 101(a)(5) and 609. *Breininger*, 493 U.S. at 94.

### B. IPA's Motion for Sanctions

As explained above, IPA is entitled to summary judgment on both counts of Greene's complaint.   Therefore, IPA's motion to dismiss pursuant to Rule 37(b) or to compel discovery [DN 51] is moot.   IPA also filed a motion for a temporary restraining order, seeking to prevent Greene from engaging in the hostile and abusive motion practice that has been Greene's hallmark throughout this litigation. [DN 55.]   But because this suit may proceed no further, the Court sees no reason at this time why a temporary restraining order against Greene's alleged abusive litigation conduct would be necessary.   That motion [DN 55] is also moot, as is IPA's motion asking the Court to reconsider its order granting Greene an extension of time [DN 62].

However, one motion does remain ripe for the Court's adjudication – IPA's motion for sanctions.   [DN 54.]   IPA claims that on July 26, 2016, the day after it filed its motion for summary judgment, Greene sent Christopher Harper, one of IPA's witnesses, a "threatening and intimidating email."   [DN 54-1 at 2.]   IPA had previously submitted Harper's declaration in support of its motion for summary judgment.   *See* [DN 50-62.]   In his declaration, Harper describes the efforts he took to have Greene's EHR notation corrected or removed, and states that IPA did not attempt to hinder his assistance of Greene.   *See* [*id.*]   Greene's July 26 email states [sic throughout]:

46

Dear Chris,

Here's some great questions that have been already crafted for you to answer in a Federal Court of law under a lie detector. Thought it might be helpful to give you a head start on how to formulate your answers:

The one question I have is who wrote Harper's declaration? It wasn't him. Looks like the IPA had their hand in this. Most people do not know how to write a declaration much less the format used.

. . .

What a terrible shame to think you were coerced to aid and abet in a Federal Crime. It's very clear you do not realize the magnitude of what you are implicating yourself in, with UPS & IPA efforts trying to thrown you under the bus to give them an alibi with your false and fraudulent "declaration," which is not even an affidavit. You have blatantly committed perjury in your falsely alleged true & correct words.

We will be quite anxious to get you under lie detector, as like you "*I believe*" you will be going to jail before this is all over. Your only hope to save yourself is with your truthful testimony as to who we both know put you up to this act of obstructing justice by knowingly aiding and abetting in a Federal Crime. *(This is certainly no way to run an Airline.)*

You should think long and hard about your conduct because it is already defeated with overwhelming evidence. The whole thing wreaks with the stench of vile filth and pathetic shame. Here's some helpful good reading to remind you what it means to be an Airline Pilot and the Code of Ethics we are supposed to live by. I am very disappointed in you Chris Harper and so will others when the truth is revealed in it's entirety sooner than you realize. My family and I will forgive you and hold you harmless for your complicity in this criminal attack against us as long as you come forward with your truthful testimony while you still can.

God Bless………………Doug Greene & Family

[DN 54-3 at 2 (emphasis in original).] Greene then attached a four-page document entitled "The Airline Pilot Code of Ethics". [*Id.* at 5-8.]

Greene's email to Harper is consistent with what the Court has come to expect from Greene throughout the course of this litigation. During this case, Greene has engaged in unwarranted, egregious name-calling. For instance, in just one brief, Greene refers to various persons involved in this case as: "incompetent," [DN 63 at 69]; "paranoid," [*id.* at 44]; "senile," [*id.* at 54]; "[a] senile old man," [*id.* at 74]; "intoxicated," [*id.* at 55]; "literally insane," [*id.* at 76]; "very devious and sick people," [*id.* at 84]; "one sick individual hell bent on sustaining Fraud Upon the Court," [*id.* at 68]; "[a] very sick man [] who has obviously lost his mental faculties and ability to reason," [*id.* at 75]; "uneducated thugs," [*id.* at 85]; "obviously incapable of reading on an 8th grade level," [*id.* at 57]; "a sadistic liar," [*id.* at 59]; "[a] pathological liar," [*id.* at 62 (emphasis removed)]; "a pathological liar in dire need of help," [*id.* at 54]; "one of the most egregious liars of all," [*id.* at 58]; "malefactors," [*id.* at 37]; "one of the biggest malefactors of all contributing to fraud in this entire masquerade," [*id.* at 69]; "guilty of perjury," [*id.* at 71]; "guilty of aiding & abetting in this crime," [*id.* at 52]; "guilty of committing Fraud Upon the Court purposely lying by omission!" [*id.* at 53]; "complicit in aiding and abetting in RICO Act fraud," [*id.* at 79]; "a bunch of clowns that are guilty of crimes worthy of criminal prosecution," [*id.* at 71 (emphasis removed)]; "a cabal of tyrants who think they are above the law," [DN 63 at 33]; "UPS' errand boys, moles, bitches, whatever word you want to use in describing a traitor . . . Benedict Arnold," [*id.* at 44]; and "Barney Fife," [*id.* at 42].

IPA argues that "Greene's threat and attempt to intimidate an adverse witness call for this Court to exercise its inherent authority to sanction Greene." [DN 54-1 at 3.]   Defendants request that, as a sanction, this Court should dismiss Greene's case with prejudice, or in the alternative, award IPA its attorney's fees in bringing the motion and enjoin Greene from intimidating or harassing its witnesses.   [*Id.* at 6.]   This Court does indeed possess "the inherent power to sanction a party" upon a showing of bad faith "or conduct 'tantamount to bad faith.'" *Dell, Inc. v. Elles*, No. 07-2082, 2008 WL 4613978 at *3 (6th Cir. June 10, 2008) (quoting *Roadway Express, Inc. v. Piper*, 447 U.S. 752, 767 (1980)).   Inherent power sanctions allow the court "to fashion an appropriate sanction for conduct which abuses the judicial process."   *Chambers v. NASCO, Inc.*, 501 U.S. 32, 44-45 (1991). However, the Supreme Court has cautioned that "inherent powers must be exercised with restraint and discretion."   *Id.* at 44.

Greene's conduct during this case and its companion cases is, quite simply, unacceptable.   *Pro se* litigants are held to a less stringent standard than lawyers, *see Haines v. Kerner*, 404 U.S. 519, 520-21 (1972), and rightfully so.   They are operating in a setting that is likely unfamiliar, and they do not have the same formal training and experience as members of the bar.   Nevertheless, this Court expects all persons appearing before it to maintain a baseline level of decorum and respect towards the Court, opposing parties, and witnesses.   Greene has repeatedly and flagrantly violated that expectation.   Greene's July 26 email to Harper may not contain any outright threats of criminal prosecution or violence, but his

accusations of criminal behavior, unsupported by substantive evidence, are inappropriate.

However, because Defendants are entitled to summary judgment on both of Greene's claims, the potential sanction of dismissal is moot.   Similarly, because this case has reached its end, the Court sees no need at this time to issue the injunction Defendants request.   The Court also declines to award Defendants their attorney's fees in bringing this motion.   Thus, IPA's motion for sanctions [DN 54] is denied.   The Court cautions Greene that by denying IPA's motion, the Court is not condoning his behavior.   Although Greene may feel strongly about his cases, he is warned that in any future litigation, the Court will not hesitate to impose appropriate sanctions.

An appropriate order will follow.

CC: Counsel of Record
Douglas Greene, *pro se*